UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

UNITED STATES OF AMERICA

v.

Docket No. 2:23-cr-145

BRENDAN SALMON, aka "Nice,"
    Defendant.

GOVERNMENT'S SENTENCING MEMORANDUM

Defendant Brendan Salmon pleaded guilty in September 2024 to conspiring to distribute cocaine, crack, and fentanyl from at least mid-2022 to November 16, 2023, and aiding and abetting false statements in the acquisition of firearms in September 2022. The Court has scheduled the sentencing hearing for July 18, 2025. That hearing will involve the presentation of evidence to provide important information to the Court about the scope and nature of the defendant's criminal conduct. Based on Salmon's criminal history and extensive criminal conduct, the government recommends a sentence of twenty years in jail, a significant sentence but well below the advisory guideline range.

I.      Introduction

Salmon, a career drug dealer in Hartford, Connecticut, with a keen interest in firearms, came to Vermont in early 2022 to exploit a new market. Over the next 18 months, he dealt significant quantities of powder cocaine, crack, and fentanyl in Lamoille and Caledonia counties. He was an astute businessman who not only sold drugs but acquired firearms presumably to traffic to buyers in Connecticut. His operation was extensive and involved various workers and associates. He had runners both from Connecticut and from Vermont, who helped distribute his drugs. He used couriers to transport large resupplies from Connecticut. For each resupply trip, the courier

1

travelled in a separate vehicle, often in tandem with Salmon, to protect Salmon's operation. In spite of multiple law enforcement interactions with Salmon's organization during 2022 and 2023, Salmon kept trafficking large quantities of drugs up to his arrest in November 2023.

Salmon has no remorse for his conduct. Even now he minimizes the extent of his crimes. There is every reason to believe that, when released, Salmon will get right back into the world he has always known. Only a lengthy sentence can protect society from this dangerous criminal.

II.    The Advisory Sentencing Guidelines

The Probation Office chose to rely on the firearms guideline for its advisory guideline recommendation of 360 months, a specific amount because Probation's calculation of 360 months to life is limited by the 30-year maximum sentence for the two crimes of conviction. The government supports this calculation and is prepared to offer evidence at the sentencing hearing to rebut the defendant's objections. But Salmon's case is also a drug case. The government thus offers as an alternative a calculation under the drug guideline, section 2D1.1.

A.  Defense Objections to the PSR

The defense raises a host of objections to the PSR's limited description of Salmon's huge trafficking organization. Those objections lack merit, and the government intends to offer proof in support of the bulk of the PSR's conclusions.

1.  Factual Objections

The defendant objects to a variety of factual statements in the PSR, many of which do not directly affect the advisory guideline and some of which might not be material to the Court's decision making. In any event, the government will offer evidence at the hearing in support of the factual statements in the PSR.

2.  Number of Firearms

Salmon falsely claims that the only firearms he possessed and "purchased" are the two guns purchased by Daigle-Arnold in the transaction associated with his guilty plea. The government will offer evidence in support of well over eight guns possessed by Salmon during the drug conspiracy and associated with the drug conspiracy. In addition to the firearms described in the PSR, the government will offer evidence about other firearms possessed by Salmon described below in more detail.

3. Stolen Firearm

Salmon falsely denies involvement in the purchase of a stolen handgun in November 2023 from Pamela Putvain. The government will offer evidence, some of which is described below, proving his involvement in the stolen gun from Putvain, including Facebook messages, pictures of the gun in Facebook, witness testimony, and the seizure of the gun by law enforcement at the time of Salmon's arrest.

4. Transfer to a Prohibited Person

Salmon objects to the five-level enhancement in section 5K2.1(b)(5)(C), apparently out of confusion. The two-gun transaction with Daigle-Arnold, which he admits, triggers this enhancement, which penalizes his effort to obtain two or more guns as a felon with controlled substance convictions.

5. Connection with Drug Trafficking

The government will provide abundant evidence that Salmon's firearm acquisitions were intimately connected with his drug trafficking. At the very least, the transaction with Daigle-Arnold, which he admits to, was connected to his drug trafficking.

6. Aggravating Role

Salmon objects to the four-level enhancement. As explained below, Salmon oversaw a drug and firearms trafficking organization with well over five participants.

B.  The Alternative Drug Guideline Calculation

Under the drug guideline, the Court must estimate the quantity of drugs involved in the conspiracy. Here, the government asserts that a conservative estimate would be that Salmon had drugs delivered to Vermont at least 20 times over the 18 or so months of the conspiracy and that each trip involved 2000 bags of fentanyl and 300 grams of cocaine/cocaine base. Even if the court used the one-to-one variance for cocaine base to cocaine, this estimate would result in an offense level of 32. (40,000 bags of fentanyl totals approximately 880 grams of fentanyl for a converted drug weight of 2,200 kg. Six kilograms of cocaine translates into a converted drug weight of 1,200 kg. Combining these two estimates yields a total converted drug weight of 3,400 kg, which falls within offense level 32.) The evidence supports several other enhancements, including two levels for possessing a firearm (§ 2D1.1(b)(1)), two levels for maintaining premises for the purpose of drug trafficking (§ 2D1.1(b)(12)), two levels for criminal livelihood (§ 2D1.1(b)(16)(E)), and four levels for aggravating role (§ 3B1.1(a)), for a total of 42, the same offense level before acceptance recommended by the Probation Office based on the firearms guideline.

The PSR posits an alternative calculation with a much lower estimate of the amount of cocaine/crack involved in the conspiracy. In this regard, paragraph 31 of the PSR fails to mention the 570 grams of powder cocaine found during the Gilman stop along with the 2700 bags of fentanyl and 119 grams of crack. In the government's view, the PSR's alternative cocaine/crack estimate is overly conservative. The PSR's alternative calculation includes two levels for a credible threat of violence to arrive at an offense level before acceptance of 42. The evidence in

4

support of the credible threat of violence is weaker than the evidence that Salmon dealt a huge

quantity of cocaine and crack.

C. Government Evidence

The government developed substantial evidence about Salmon's drug trafficking

organization, including data from phones, Facebook, and location monitoring, many witness

statements, and multiple seizures. The government will offer some of that evidence at the

sentencing hearing, in part through the testimony of the case agents involved in the investigation

who will explain various exhibits, the grand jury testimony of several accomplices, and the live

testimony of three coconspirators.[1]

1.  Josh Levaggi

Josh Levaggi met Salmon when Salmon began coming to Vermont to sell drugs. Levaggi was

introduced to "Nice" with "Mitch" in early 2022 at a Vermont Airbnb. Levaggi had met Mitch

(Darnell Jones) in Hartford earlier. Levaggi had gone to Hartford to buy drugs with a friend,

Beau Bouchard. Bouchard encouraged Mitch to come to Vermont to sell drugs, and Mitch

brought his friend and then-partner Salmon along with him. Levaggi knew that Bouchard and

Bouchard's then-girlfriend, Erica Levaggi (Levaggi's sister) also became customers of Salmon

and Mitch. At some point later in 2022, Mitch stopped coming to Vermont and Salmon took over

the customer base.

Levaggi began dating Cheyenne Westcom in July 2022. Westcom was also a customer of

Salmon and Mitch prior to her relationship with Levaggi. Prior to the relationship, Levaggi

bought personal use fentanyl and crack from Salmon and Mitch, who came to Vermont at that

---

[1] The government will file various materials for the Court to review prior to the hearing under
seal to protect witness safety and grand jury secrecy.

time once every two weeks, staying in Airbnbs around Stowe. At some point, Salmon began fronting Levaggi drugs. Levaggi's drug purchases increased after he and Westcom became a couple. Salmon fronted Levaggi larger quantities of drugs to sell when Salmon left town to go back to Hartford. On January 13, 2023, Levaggi and Westcom were arrested and approximately 70 bags of fentanyl were found in his car. He testified that these drugs were left by Salmon for he and Westcom to distribute. He also testified that his drug debt to Salmon totaled $20,000 before that debt and the January 2023 arrest tempered his relationship with Salmon.

Later in 2023, Levaggi continued to deal with Salmon sporadically. He was aware that Salmon began dealing with the Fredette clan in Hardwick and began selling out of Doug Stokowski's house in Morristown.

2. Michael Ulrich

Ulrich, a federal drug defendant, also dealt with Salmon in 2022. Ulrich met Salmon at Graham "Scotty" Taylor's house near Stowe. Ulrich also met Mitch around the same time. Ulrich understood at that time that Salmon and Mitch had not established their operation fully in Vermont. Ulrich purchased from Salmon into early 2023, until Ulrich's name "came up in the newspaper" and Salmon stopped dealing with him. Ulrich knew that Salmon had a business relationship with Bowie (Beau Bouchard), where Bowie ran drugs for Salmon. Indeed, at the beginning, Ulrich bought drugs from Bowie that he understood came from Salmon. Later, Salmon became comfortable enough to deal directly with Ulrich. Ulrich dealt with Salmon at various Airbnbs in the Stowe area. Ulrich learned about Salmon's arrivals in Vermont because he was one of the customers whom Salmon alerted when he travelled to Vermont.

Ulrich also knew Josh Levaggi, who told Ulrich that he was "responsible" for bringing Salmon and Mitch to Vermont. Ulrich understood that Salmon was one of the largest drug

suppliers in Lamoille County in 2022. He also understood that at some point in 2022 Erica

Levaggi become one of Salmon's drug runners and that Erica was romantically involved with

both Salmon and Mitch. Ulrich purchased drugs from Erica when Salmon was out of town,

which he understood came from Salmon. At some point in 2022, Bouchard left Vermont, in part

because he had a large debt to Salmon. And on occasion, Ulrich saw Salmon with multiple

ounces of crack and perhaps 1000 bags of fentanyl in Airbnbs in the Stowe area.

Ulrich was also aware of the change in Erica's relationship with Salmon after Erica was

arrested with about 900 bags of fentanyl in December 2022. Ulrich was aware that Salmon began

working more closely with Cheyenne Westcom after Erica's arrest.

Finally, Salmon asked Ulrich to provide him with firearms. Ulrich understood that Salmon

was a gun dealer, acquiring firearms in Vermont that he would sell in Connecticut. Ulrich did not

trade firearms with Salmon, but he did witness Taylor trading three firearms with Salmon.

3.  Erica Levaggi

Erica Levaggi described her drug relationship with Salmon during several meetings with law

enforcement. First, after Levaggi was charged with drug trafficking in October 2022 in state

court, she made various admissions about her purchases from Salmon. She admitted that she had

met Salmon several months before through Bouchard. She said that she was in a romantic

relationship with Salmon, who regularly provided her with crack and stacks (100 bags) of

fentanyl, and that Salmon fronted her drugs. At that time, law enforcement reviewed Erica's

phone which showed drug-related conversations with Salmon, including a reference to "Tracey"

(obviously Tracey Nelson, described below), who would bring drugs to Erica. In this October

interview, Erica expressed concerns about her physical safety from talking about Salmon.

Erica was arrested again by state law enforcement on December 7, 2022. At this time, law enforcement found over 900 bags of fentanyl in her car. Initially, she described the 900 bags as belonging her "her boys" but later admitted to law enforcement that she was dealing the fentanyl for Salmon.

In a later proffer meeting, Erica described meeting Salmon and Mitch through Bouchard, her child's father. Salmon was Mitch's boss. She had romantic relationships with both Salmon and Mitch. Salmon stayed at Scotty Taylor's house before staying in the Stowe area in Airbnbs. She was provided multiple stacks of fentanyl from Salmon to sell. She was aware that Salmon asked about acquiring firearms in Vermont. She further stated that Westcom and Ellen Fredette were large customers for Salmon for both fentanyl and crack. Erica said that her December 2022 arrest altered her relationship with Salmon.

4. Bowie Don Facebook

As part of the investigation, the government obtained by search warrant the Facebook account for Bowie Don, which the defendant used to conduct his drug and gun business from mid-2022 until he was arrested in November 2023. The account was originally opened by Beau Bouchard in early June 2022, but the account communications confirm that Bouchard left Vermont soon thereafter for rehab and never returned. By late June, Salmon was using the account as a principal means of communicating with customers.

The account records show that Salmon communicated with scores of drug customers. The messages are replete with drug negotiations for various quantities. Salmon also spoke with customers about acquiring firearms, both purchased at Parro's gun shop by drug customers or offered to Salmon on Facebook. The messages also corroborate the statements and testimony of various witnesses or confederates. For example, during 2022, Salmon regularly directs customers

to "Erica" for drug sales, when Salmon was in Connecticut. Moreover, the Facebook messages paint a detailed timeline of Salmon's travel between Connecticut and Vermont, because he often tells customers where he is.

5. Dakota Daigle-Arnold

Dakota Daigle-Arnold was a powder cocaine user in the fall of 2022. He knew Ray Smith, a Lamoille County low-level drug user and distributor, who bought from Salmon. In September 2022, Smith approached Daigle-Arnold and asked him to buy a Glock for Smith's drug dealer in exchange for cocaine and cash. Daigle-Arnold agreed to make the purchase, meeting Smith at Parro's Gun Shop on September 13. 2022. While in the gun shop parking lot, Smith went to the dealer's white Chevy Tahoe and met with the driver. Smith came back with the money for the gun, which he gave to Daigle-Arnold, who saw the interaction between Smith and driver of the Tahoe, though Daigle-Arnold did not know Salmon at that time. Daigle-Arnold went into Parro's, bought the gun he was told to buy, and brought the gun to Smith, who then went to Salmon's Tahoe with the gun. Daigle-Arnold saw Smith get out of Salmon's Tahoe and then provide Daigle-Arnold with his crack and cash. The Bowie Don Facebook messages with Ray Smith confirm that Salmon was dealing drugs to Smith and that Smith and Salmon had numerous Facebook calls on September 13.

Two days later, Salmon, using the Bowie Don Facebook, contacted Daigle-Arnold on Facebook. Salmon identified himself as "the kid you met the other day with Ray." Almost immediately, Salmon arranged directly with Daigle-Arnold to buy two handguns, a Glock and a Ruger, from Parro's, again in exchange for cocaine. The Bowie Don Facebook shows messages in which Salmon identifies the guns he wants. Salmon has pleaded guilty to this straw purchase on September 19, 2022. Smith was not involved. Salmon picked up Daigle-Arnold in Hyde Park

and drove him to Parro's. Salmon, using the name "Nice," drove the Chevy Tahoe Daigle-Arnold recognized as the same car as the one driven by Smith's dealer during the straw purchase a few days before. After the purchase, which included two lasers and ammo, Daigle-Arnold returned to the Tahoe and received the drugs he had arranged to be paid by Salmon, and Salmon drove Daigle-Arnold back to Hyde Park. Salmon later asked Daigle-Arnold to purchase guns again, but Daigle-Arnold decided against a third purchase, though he continued to buy drugs from Salmon.

6. Amanda Laraway

Amanda Laraway, another federal drug defendant, knew and dealt with Salmon for much of the charged conspiracy. In September 2022, Laraway, a long-time addict who sustained her habit by "boosting" or stealing on behalf of drug dealers, lived with Erica Levaggi in a trailer in Johnson, Vermont. Laraway observed that Levaggi was acting as a distributor for Salmon. Laraway knew that Salmon provided Levaggi with multiple stacks (each one hundred bags) of fentanyl and a half-ounce to an ounce of crack at various times. She also knew that Salmon left drugs for Levaggi to distribute when Salmon left town and that Levaggi was arrested with drugs from Salmon in December 2022. Laraway saw Salmon himself with large quantities of drugs including bags of fentanyl stacks and multiple "cookies" of crack.

Laraway also knew that Bouchard worked for Salmon before he moved out of state and that Salmon used the Bowie Don Facebook to communicate with customers. She recalled that she used the Facebook account of her friend Dilan Jiron during 2023.

Laraway also learned about various associates of Salmon, who worked with Salmon in 2023, including "Kurt" (identified by law enforcement as Richard Williams), whom Laraway purchased drugs from on multiple occasions. Laraway also learned about another Salmon

associate, Clarissa, who operated out of the Burlington area. (The Bowie Don Facebook confirms Salmon's relationship with Clarissa, Exhibit 1.)

Finally, Laraway purchased drugs on multiple occasions in the fall of 2023 from Carrie Adams's residence in Hardwick. She saw and arranged purchases with Salmon and his associates at the Adams residence and knew that Salmon was living part-time at the residence in November 2023. Laraway understood that Ellen Fredette sold drugs for Salmon. Laraway and Jiron traded two stolen, large-screen televisions with Salmon for drugs at the Adams residence on November 15, 2023, the day before Salmon was arrested there. (Agents observed these items at the time of the search.)

Further, Laraway learned that Pamela Putvain traded a handgun with Salmon for drugs just before Salmon was arrested. Laraway spoke with Putvain about the transaction, hearing that Putvain obtained the gun from Casey Ainsworth, who had stolen the handgun. Putvain negotiated the trade on the Bowie Don Facebook on November 15 and that same gun was seized at the Adams residence on November 16, 2023. The handgun and the magazine were found in a bedroom occupied by Lincoln Robinson, a Salmon associated discussed below.

7. Douglas Stokowski

Stokowski, another federal drug defendant, regularly assisted drug traffickers by selling their drugs out of his residence in Morrisville, Vermont. Stokowski met Salmon in mid-2023. Prior to meeting Salmon, Stokowski had heard of "Nice" and understood that Josh Levaggi and Cheyenne Westcom were selling drugs obtained from Salmon. Over several months, Stokowski allowed Salmon and several of his workers from Connecticut to sell cocaine, crack, and fentanyl from this house during the day. Stokowski often assisted with the hand-to-hand exchanges with customers. Stokowski remembered the name of two of Salmon's workers as "Black Pat" and

11

"Black." On occasion, Salmon would also arrange to have his customers buy from Stokowski at his residence.

Stokowski also obtained drugs from Ellen Fredette for sale out of his residence. He understood from his dealings with Salmon and Fredette that she was working with Salmon. Stokowsky also purchased drugs from Salmon on occasion in Hardwick, including once from Carrie Adams' residence. Salmon asked Stokowski to buy guns for him, but Stokowski declined.

8. Dorothy Wilde

Dorothy Wilde is another federal defendant who regularly obtained drugs from Salmon. She began dealing with Salmon in the summer of 2022. She purchased crack from him at least once a week in amounts from an eight-ball (3.5 grams) to an ounce. She purchased drugs from Salmon at a variety of Stowe area residences, as well as at Elaine Brochu's residence in Hardwick and Stokowski's residence in Morristown. She understood that Jillian Peets and Ellen Fredette were significant customers of Salmon.

During her dealings with Salmon, Wilde also interacted with several of Salmon's workers, including two black men whose street names she could not remember.

Wilde was the subject of law enforcement activity associated with the Salmon investigation on September 12, 2023, which corroborates her description of Salmon's use of runners and of Elaine Brochu's residence. On that day, DEA agents were surveilling an SUV rented by Bernard Barrett. Agents saw the SUV leave Elaine Brochu's residence in Hardwick and travel to the Piecasso Restaurant in Stowe. There, agents observed a short meeting between the driver of a truck registered to Jesse Bassett and the two men in the SUV. Immediately after the Bassett truck left the lot, the passenger in Wilde's car interacted with the two men in the SUV before returning to Wilde's car after a short time.

After Wilde's car left the parking lot, law enforcement spoke to the two men in the SUV, the driver, Bernard Barrett, and the passenger, Richard Williams. The two men claimed to be visiting Vermont from Connecticut; they drove to Piecassa to eat, but realized the restaurant was closed. At the same time, other law enforcement officers stopped Wilde's car. Wilde admitted that she had arranged a crack transaction for her passenger by text messaging with Salmon, who told her to purchase from his runners. The passenger admitted buying crack from the men in the SUV and handed over a user quantity of crack. Wilde consented to law enforcement reviewing the text messages on her phone, which contained texts with Wilde's contact "Nice" setting up the drug deal. "Nice's" phone number on Wilde's contact was a number known to be used by Salmon. Moreover, during the law enforcement interaction, Salmon called Wilde, who agreed to allow law enforcement to record a call with Salmon. During that short phone call, Salmon asked "Dorothy" to "let me call you right back." Wilde noted that she had been "picked up but they let me go." Salmon said, "yea, that's why I was trying to call you, cause they said that . . . I'm going to call you right back." Salmon never called back.

9.  Tracey Nelson

Nelson, one of Salmon's co-defendants, purchased heroin and fentanyl from Salmon for a decade. Nelson lives in Connecticut. During her decade of opiate addiction, Salmon was Nelson's most frequent supplier in the Hartford area. On several occasions over the years, she saw Salmon with a gun in his car while selling to Nelson in Hartford. She became a courier of Salmon's drugs from Connecticut to Vermont in 2022. She was stopped during a courier trip in June 2023. She and her mother were in the car. She had a locked bag in the car containing 2700 bags of fentanyl, and over half a kilogram of cocaine and crack.

Nelson's first trip to Vermont involved Salmon asking her to bringing drugs to Vermont for "Mitch." It was Nelson's first trip to Vermont. She delivered the drugs to Mitch in Burlington in 2022. After this first trip, Nelson began bringing a locked bag, which she understood to contain drugs, to Vermont for Salmon. She made over a dozen trips for Salmon, often to Airbnbs, before she was stopped on a trip in June 2023. On one occasion, she saw a gun in Salmon's car in Vermont, while making a delivery to Salmon at a restaurant in Stowe. Salmon also told Nelson that he had two other couriers who performed the same job as Nelson, on other occasions, Gary Foley and Nick (Gilman). On one occasion, Foley confirmed to Nelson that he was working for Salmon. Nelson never met Nick.

The trips took place in consistent fashion. She met Salmon near her home in Connecticut and received a locked bag containing drugs. She drove to Vermont, often with her mother, who was trying to look out for Nelson's safety. (Nelson's mother corroborated Nelson's description of her work for Salmon.) Nelson also dealt with Salmon's girlfriend in Connecticut. She spoke with Salmon and his girlfriend about Salmon's work and personal relationship with Erica Levaggi. Indeed, Nelson delivered the drugs to Salmon at Erica's trailer in Johnson on two occasions. Nelson knew from Salmon that Erica was also selling for Salmon when Salmon was in Connecticut. Salmon also told Nelson about Erica getting arrested with a large quantity of Salmon's drugs. Nelson also witnessed Salmon's drug dealing relationship with Ellen Fredette, to whom she delivered drugs for Salmon on at least four occasions. On one of those occasions, Nelson spent several hours with the Fredettes, personally witnessing their drug trafficking.

10. Nicholas Gilman

Three months after Nelson was stopped carrying a large quantity of drugs to Vermont for Salmon, Gilman, another co-defendant, was stopped while delivering a similar quantity of drugs

14

to Salmon in Vermont. Gilman, another long-time addict, started buying heroin from Salmon in Hartford around 2017. Gilman too began driving drugs to Vermont for Salmon in 2022. Gilman also knew Mitch, whom Gilman drove to or from Vermont at Salmon's request. And on at least one occasion, Gilman delivered drugs to Mitch in Vermont for Salmon.

Gilman's trips were similar to Nelson's. The trips were arranged by Salmon who put the bag containing drugs into Gilman's car in the Hartford area. Salmon told Gilman where in Vermont to meet him. Salmon drove in a separate car. Gilman recalled approximately six trips in the summer and fall of 2022. Gilman remembered nine or ten trips in 2023. Gilman also took a backpack from Vermont to the Hartford area at least once. On this occasion, Salmon contacted Gilman the next day saying that he was looking for something that might have fallen out of the backpack. Gilman then found that a handgun in his car trunk where the backpack had been. Gilman then delivered the handgun to Salmon in Hartford. Again, the text messages between Salmon and Gilman corroborate this handgun delivery.

Law enforcement had seized Gilman's phone in the September 2023 stop. That phone contained text messaging with Salmon corroborating ten trips between April 27, 2023, and September 1, 2023, that is ten trips before the trip when Gilman was stopped. Moreover, law enforcement obtained surveillance footage from Connecticut at the location where Gilman received the drugs from Salmon on the day he was stopped by law enforcement in September 2023. That surveillance footage shows that Barrett was with Salmon at the drop-off.

11. Salmon's Firearm Trafficking

In addition to being a large-scale trafficker of cocaine, crack, and fentanyl, Salmon used his Vermont connections to acquire firearms, most of which he presumably sold in the Hartford market. The PSR notes that Salmon possessed between 8 and 24 firearms. In addition to those

mentioned in the PSR, the evidence shows that Salmon regularly acquired firearms in Vermont from his drug customers. Almost every customer witness told law enforcement that Salmon asked about getting guns. At the sentencing hearing, the government will offer evidence from the Bowie Don Facebook showing that Salmon obtained two firearms from Jesse Bassett, a drug customer, on August 18, 2023, which Salmon directed Bassett to purchase at Parro's, just as he did with Dakota Daigle-Arnold. The Facebook evidence also shows that he acquired a handgun from Deanna Marie Savage in May 2023, which Savage asked to be purchased back from Salmon shortly thereafter. As noted above, in July 2023, Gilman found a handgun in his trunk after Salmon hired him to bring a backpack back from Vermont. Further, Salmon was arrested on November 5, 2023 in Cromwell, CT, after a handgun was found in his possession during a car stop.

At the sentencing hearing, the government will also offer evidence from a lengthy text message conversation between Salmon and Lincoln Robinson, a friend of Salmon's who was also staying at Carrie Adams' house at 133 Spring St. in Hardwick at the time Salmon was arrested. During this text messaging Salmon and Robinson discuss buying and selling various firearms between April 2022 and November 2023. This text evidence further corroborates that Salmon was a firearms trafficker while dealing drugs in Vermont.

12. Other Location Information Regarding Salmon

The government has obtained a wide variety of evidence about Salmon's travel to and from Vermont during the conspiracy. For example, Airbnb records corroborate Salmon's presence in Vermont in 2022 at times that the Bowie Don Facebook directs customers to those Airbnb residences. (Salmon used the name of a Connecticut friend to rent many of the Airbnbs.) Law enforcement also obtained car rental records consistent with vehicles Salmon used during 2022

16

and 2023. (Salmon used the name of another friend to rent some of the vehicles.) The government will present further details about this evidence at the hearing.

The DEA also monitored the locations of Salmon's phone from late July until his arrest. Salmon changed phones after Gilman's car was stopped and drugs were seized in September 2023, but agents quickly learned about Salmon's new phone number and obtained location information about that phone. Agent Matthew Zastrow has summarized that location information in a report attached as Exhibit 2. The report shows the frequency of Salmon's trips to Vermont for business, including dozens of trips to Vermont, as well as several trips to New York. (Salmon admitted to agents as the location of his cocaine source of supply.) The records also corroborate the witnesses about the locations Salmon trafficked out of during the fall of 2023, including Stowe, Morrisville, and Hardwick.

III.    Section 3553(a) Factors

The advisory guidelines counsel for a thirty-year sentence. The Court should use that guideline as a starting point as well as a guidepost that Salmon should receive a substantial jail sentence. If anything, the advisory guidelines rely on conservative views of about the scope of Salmon's drug and gun trafficking. He likely handled many more guns and substantially more drugs. Despite the absence of any significant mitigating evidence, the government recommends a sentence well below that advisory guideline range. Here, the section 3553(a) factors suggest that Salmon receive a twenty-year jail sentence and period of supervised release of at least five years.

Turning first to the seriousness of the offenses, Salmon's successful efforts to profit by wrecking the lives of Vermonters should be viewed as among the most serious crimes in this district. His crimes were driven by greed. The Court knows the ravages from fentanyl addiction and extensive crack use; families and futures are destroyed. Here, Salmon also took advantage of

17

these addictions to obtain firearms to make further profit by trafficking them to drug dealers in Connecticut. Thus, he was making money in both directions and wreaking havoc in two directions as well. It is rare for this Court to be sentencing a large-scale fentanyl trafficker who operated in Vermont for over eighteen months. These unusual crimes deserve an unusual sentence.

Turning next to Salmon's history and characteristics, his history proves that he will return to drug trafficking after his release. Salmon has only known drug dealing. He testified in federal court in Connecticut in October 2022. During that testimony he made a variety of statements about his life of drug dealing and about going back to drug dealing every time he was released from jail. His testimony about his criminal background is corroborated by the PSR in Salmon's prior federal cases. He admitted during the testimony that he had been selling heroin and crack before 2013. Salmon Testimony at 8, 13, 20. In 2013, he was selling drugs every day. *Id.* at 22. He also stated that he was arrested for a felony drug crime in 2013 and later pleaded guilty. *Id.* at 51-52. At the time, he was serving a special parole sentence for his 2010 firearms felony, and he later admitted violating that special parole. *Id.* at 80-81. He was detained in 2013 until he began cooperating in 2014 to get himself a more lentient sentence. *Id.* at 82-83. Salmon was back dealing drugs in 2016. *Id.* at 63. He was arrested on new federal drug charges as part of a federal gang case in February 2017. *Id.* He admitted that after he made bail on that charge, he went back to drug dealing again. *Id.* at 66-67. Indeed, Salmon was dealing drugs after signing his federal plea agreement in late October 2017. *Id.* at 105-07. About a week after agreeing to plead guilty, he was arrested again in November 2017 by Connecticut State Police on a new drug charge. *Id.* at 106-07. Despite being on federal conditions of release, Salmon possessed thousands of bags of heroin, other drugs, and three loaded handguns. The Connecticut state charge was adopted by the

18

federal authorities, and Salmon pleaded to this separate offense. Salmon was sentenced in 2018, on both the February 2017 drug charge and the November 2017 drug charge, with a substantial benefit for cooperation. Finally, while under oath in a federal trial and supposedly providing truthful cooperation, Salmon falsely denied being involved in drugs while on supervised release. *Id.* at 121.

He has repeatedly demonstrated disregard for court conditions. Salmon was selling drugs in Vermont while on federal supervised release from his prior federal drug felonies. Salmon was serving his supervised release term until September 2022 but began dealing in Vermont in early 2022. Supervised release provided no incentive to stop his continued criminal conduct. Salmon confirmed his drive to engage in criminal conduct by his conduct after being arrested on Connecticut felony firearms charges on November 5, 2023. At 5am that day, police found Salmon sleeping in his rental car in Cromwell, CT. Salmon was alone in the car with a loaded handgun. Doc. 12-2. Salmon was charged with various offenses, including a felony firearms charge. Salmon made bail a few days later, and the court issued a condition that Salmon not possess firearms. Salmon went right back to drug and firearms trafficking.

All the principles of sentencing support a substantial period of incarceration. Profiting from drug and firearms distribution deserves severe retribution. Society, and especially the Vermont criminal justice system, should send the general deterrence message to large scale drug and firearms traffickers that such conduct will result in substantial punishment. Even more significantly, society should be protected from Salmon for a lengthy period of time. Conduct like Salmon's would result in a sentence of twenty years in most of the judicial districts in this country.

Greed driven dealers access the costs and profits of dealing in Vermont. Vermont should not continue to signal to the drug trafficking world that dealers can make huge profits here and receive lighter punishment if caught.

Dated at Burlington, in the District of Vermont, 9th day of June, 2025.

Respectfully submitted,

MICHAEL P. DRESCHER
Acting United States Attorney

By: /s/ Paul J. Van de Graa
PAUL J. VAN DE GRAAF
Assistant U.S. Attorney
P.O. Box 570
Burlington, VT 05402-0570
(802) 951-6725